UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ADA WEIER, individually and as
Personal Representative of the
Estate of GREGORY WEIER,

      Plaintiff,

v.                                                                                          Case No. 1:05-CV-420

UNITED RENTALS (NORTH                                              HON. GORDON J. QUIST
AMERICA), INC. and BRODERSON
MANUFACTURING CORP.,

      Defendants.
_____/

## OPINION

      Plaintiff, Ada Weier, individually and as Personal Representative of the Estate of Gregory Weier ("Weier"), has sued Defendants, United Rentals (North America), Inc. ("United") and Broderson Manufacturing Corp. ("Broderson"), alleging claims of negligence and breach of implied warranties against both Defendants.[1] Plaintiff alleges that Defendants are liable for Weier's death, which occurred when a crane manufactured by Broderson and leased by United to Weier's employer tipped over as a result of an overloaded condition. Now before the Court are United's motion for summary judgment and Broderson's motion for summary judgment.[2] For the reasons set forth below, the Court will grant both motions.

---

[1] Plaintiff initially filed this case in the Northern District of Illinois against only United. That court transferred the case to this district upon Plaintiff's motion to transfer venue. Subsequent to the transfer, Plaintiff added Broderson in a second amended complaint filed on December 14, 2005.

[2] Plaintiff never responded to this motion. She states in her response to United's motion, however, that she has no objection to granting Broderson's motion.

## I. Facts

United is engaged in the business of renting heavy equipment, including cranes, for various industrial uses. Underwater Construction Company ("UCC") is a national construction company with expertise in underwater construction projects. In May 2003, UCC was performing a job for Consumers Energy at its Ludington, Michigan power plant. Specifically, the project was performing maintenance on Consumer Energy's barrier net, which spanned several miles in Lake Michigan and served to prevent fish and other marine life from being sucked into the power plant's turbines. The work included inspecting the net and repairing any damage, cleaning the net, and inspecting, repairing, and maintaining the anchor pilings. UCC had been performing the work on this project since 1995. Another company, Townsend & Bottum, had performed the work for a number of years before that.

Weier became employed with UCC in 2001 as the captain of the Jasper, a jack-up work vessel. In addition to being a licensed captain, Weier was a crane operator, a welder, a mechanic, and a certified commercial diver. Weier had previously worked on the Ludington project for several years as an employee of Townsend & Bottum before the work was awarded to UCC, and he had declined a previous offer of employment that UCC made to him after it began performing the work.

During the May 2003 work, Weier was in charge of operating the crane for replacing the pilings on the net. Prior to this time, UCC had subcontracted the crane work out to King Company, which had used a heavy overhead crane and a vibrating hammer to sink the pilings. However, Weier proposed to UCC that instead of subcontracting the work, he would do the crane work himself using a rented crane and a vibratory tool powered by a hydraulic power pack. UCC approved his recommendation.

Case 1:05-cv-00420-GJQ   ECF No. 63 filed 12/11/06   PageID.964   Page 3 of 14

Weier decided to rent a crane from United.  He had previously rented a crane from United, a 5550RT, for a project at the Cook Power Plant in 2001.  Weier decided to rent a Broderson Model IC-200-3D crane ("IC-200" or "crane").  The IC-200, like the 5550RT that Weier had previously rented from United, had a maximum lifting capacity of 15 tons.[3]  United purchased the IC-200 from Broderson in October 2000.  The IC-200 was not equipped with an operator aid device that would warn the operator of a potential overload situation.  The 5550RT also had not been equipped with an overload warning device.  Such devices, which include load indicators ("LI"), rated capacity indicators ("RCI"), and rated capacity limiters ("RCL"), were not required equipment on cranes at the time Broderson manufactured the IC-200.  In March 2002, the pertinent committees responsible for the American National Standards Institute ("ANSI") regulations applicable to cranes and other equipment modified the regulations to provide that crane manufacturers were required to provide an LI, an RCI, or an RCL on cranes manufactured after the effective date of the addendum.  An interpretation issued subsequent to the adoption of the new regulation indicated that a crane manufactured prior to the effective date of the regulation that was not equipped with an overload indicating device would be in compliance with the new regulation, ASME B30.5a-2002.  Thus, the revised regulation did not impose a duty to retrofit existing cranes with such devices.

In making arrangements for the crane rental, Weier spoke to several people at United, including Dan Taylor, the rental coordinator.  At Weier's request, Taylor faxed Weier a load capacity chart for an IC-200 crane.  According to Plaintiff's allegations, Taylor faxed a load lifting chart for a model IC-200-1E crane rather than a load lifting chart for a model IC-200-3D crane, which United

---

[3] Plaintiff states in her brief that the 5550RT crane would have been larger and had a bigger lifting capacity than the IC-200, but, as United notes, the delivery sheet for the 5550RT and the load chart for the IC-200 show that both cranes had the same maximum capacity of 15 tons.

3

ultimately delivered to UCC. Plaintiff's expert, Dr. Jerry Purswell ("Purswell"), has testified, however, that sending the IC-200-1E chart instead of the IC-200-3D chart had no effect on the events in this case. (Purswell Dep. at 141.) United delivered the IC-200 to the job site on Friday, May 2, 2003. United also furnished a load capacity chart, a safety manual, and an operator's manual. The safety manual contained the following warnings: (1) "Do not operate the machine *without the proper crane manufacturers load rating charts*."; (2) "Never exceed crane manufacturer's load ratings."; (3) "Know the rated capacity of the machine."; and (4) "Crane mounted devices which indicate load conditions by visual or audible signals are not a substitute for strict adherence to all safe operating procedures."

In addition to renting the IC-200, UCC rented a vibratory tool from H & M Vibro for driving the pilings into the floor of Lake Michigan. The vibratory tool was a model H-150 vibratory driver/extractor, with a Model 3208 Diesel Power Pack and pipe clamp. At the time it delivered the vibratory tool to UCC on May 2, 2003, H & M Vibro provided an instruction sheet, a parts manual, and written warnings. The warnings stated, among other things: "**Danger** . . . Pile extraction can provide high loads in crane structural components. Load indicators and/or load moment indicators should be used . . . at any time that hook load is not known. Consult crane manufacturer for specifications."; and "**Caution**. Do not overload the crane. Crane operators must determine the loads and stresses on their cranes when using this product." The same warnings also would have been affixed to the machine by decal, although there is some question about whether the warning labels could be read prior to the time of the accident.

The work crew began driving the pilings on Saturday, May 3, 2003. The IC-200 was positioned on the Jasper with the vibratory tool attached. Weier operated the IC-200 to lower the

vibratory tool and a hollow steel anchor pipe to the bottom of the lake, where divers would use the vibratory tool to drive the pipe into the lake bed.  The crew continued its work the next day, Sunday, May 4.  By the end of those two days, the crew had set about 18 pilings without incident.  The crew started on Monday, May 5, at about 7:00 a.m. with a safety meeting and began to drive the first piling at about 10:00 a.m. on the north leg of the net at anchor location BH, in 12-15 feet of water.  After this piling was set, the crew broke for lunch because the waves became too big and the weather conditions turned unfavorable.

The crew returned to work at about 12:30 p.m. when the weather improved.  Weier maneuvered the Jasper into position on the west leg of the net, with the front of the Jasper and the front of the crane facing east toward the net.  The current was moving in an easterly direction from the back to the front of the vessel.  The boom of the crane was extended approximately ten feet over the front of the bow, with the vibratory tool and a steel piling attached, either completely submerged in the water or with the vibratory tool sticking out of the water slightly.  As Weier maneuvered the apparatus into place, a hydraulic line leading to the vibratory tool became tangled around the crane cable. Jon Shelton, the project manager, signaled to Weier to stop the crane and walked to the cab to tell Weier about the entangled cable.  Weier then moved the crane to the left to try to untangle the hydraulic line, and Shelton returned to the cable.  When the cable became untangled, Shelton returned to the cab and told Weier that the device was clear.  After Shelton went back to the front of the bow, Mark Pawlus went to the cab and had a brief conversation with Weier about releasing the diver to the bottom.  As Pawlus was returning to the dive shack, he heard a loud noise, turned around, and saw the crane starting to tip over.  The cab came into contact with a steel winch cable assembly, crushing Weier to death.  When the crane came to rest, it was upside down.

5

The investigation following the incident concluded that the crane overturned when currents moved the submerged load out from over the outriggers, creating an overload situation that caused the crane to tip. Plaintiff's expert, Dr. Purswell, testified that at the time of the accident, the load on the crane exceeded the lifting capacity by at least 740 pounds and possibly by as much as 1300 pounds. The weight of the load, including the vibratory tool, the piling, and the load block, was 4,860 pounds. (Purswell Dep. at 51.) Using an estimated load radius of 34 feet based upon the available information, Dr. Purswell determined that the lifting capacity of the crane would be 4,520 pounds. (*Id.* at 52.) Because the boom extension was stored on the base of the boom, another 400 pounds would need to be deducted from the lifting capacity, thus making the lifting capacity 4,120 pounds. (*Id.* at 54.) In addition, if the angle of the crane was 45 degrees or more to the left, as Jon Shelton had indicated in his 2003 written statement, the lifting capacity would be reduced to 3,560 pounds. (*Id.* at 56, 59.) Finally, Dr. Purswell testified that the underwater current at the time of the accident, which was going from the back to the front of the vessel, would have moved the load away from the crane, thus increasing the load radius and exacerbating the overload situation. (*Id.* at 60-61, 124.)

## II. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to

6

find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### III.  Discussion

As noted above, United and Broderson have both moved for summary judgment. Plaintiff did not respond to Broderson's motion, but in her response to United's motion she confirms that she does not oppose Broderson's motion because she "is aware of no manufacturing defect or design defect attributed to Broderson as of the date of manufacture of th[e] [IC-200] in the year 2000." Accordingly, Broderson is entitled to summary judgment.

Plaintiff has asserted two claims against United, negligence and breach of implied warranties. Plaintiff alleges that, although the IC-200 was not defective when United purchased it from Broderson and that the condition of the crane had not changed since the date of purchase, United is liable for Weier's death because United failed to provide a crane equipped with a device such as an RCL that would have warned Weier of the overload situation. United contends that it is entitled to summary judgment because: (1) the IC-200 was not defective at the time of manufacture or thereafter because there was no requirement that it be retrofitted with an RCL; (2) United had no duty to provide a crane with an RCL; (3) Weier's own negligence in overloading the crane was the sole proximate cause of Weier's death; (4) United did not breach any duty to warn; and (5) United disclaimed any implied warranties through the rental and delivery documents for the crane at issue in this case as well as through the parties' prior course of dealing.

Under Michigan law, a plaintiff may bring a negligence claim and/or a breach of implied warranty claim against a lessor of a chattel. *See Hendin v. Oakland County Parks*, No. 213614, 2002 WL 181760, at *5 (Mich. Ct. App. Feb. 1, 2002) (per curiam). A negligence theory generally

focuses on the defendant's conduct, while an implied warranty theory generally focuses upon the fitness of the product regardless of the defendant's conduct. *See Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 692, 365 N.W.2d 176, 186 (1984). To establish a prima facie case of negligence, a plaintiff must show that the defendant breached its duty and that the breach was the proximate cause of the plaintiff's injuries. *Richardson v. Mich. Humane Soc.*, 221 Mich. App. 526, 528, 561 N.W.2d 873, 874 (1997). To establish a breach of implied warranty, a plaintiff must show that the product was defective when it left the hands of the seller or lessor and that the defect caused the plaintiff's injuries. *Jodway v. Kennametal, Inc.*, 207 Mich. App. 622, 629, 525 N.W.2d 883, 889 (1994). In addition, "where a bailor leases a machine to a bailee and injury results, liability cannot attach to the bailor as a result of an improper use over which the bailor has no control." *Webb v. Travelers Ins. Co.*, 98 Mich. App. 157, 162, 296 N.W.2d 216, 218 (1980).

A.      **Plaintiff Has Failed To Show That United Was Negligent**

Plaintiff alleges in her complaint that the crane was "defective" because

> the crane provided by United Rentals in May of 2003 violated state and federal regulations and/or industry standards in that it failed to have a rated capacity limiter, load limiting device or other load moment indicators to warn operators of potential overload situations which would result in the potential for tipping over the crane.

(2d Am. Compl. ¶ 29(c.).) Plaintiff contends that United was negligent because:

> United Rentals should know how its cranes are being used, due diligence requires it. United Rentals did not check to make sure the operator knew how to use the crane, show [Weier or UCC] how to use it, or apparently understand the use to which it was being put. United Rentals' conduct in all areas of this leasing situation was negligent and breached implied warranties of fitness.

(Pl.'s Resp. Br. at 14.)

At the outset, the Court notes that Plaintiff confirms that she "has not brought a product liability action against United." (*Id.* at 13.) Rather, she asserts, as Michigan law permits, that

8

United breached the ordinary standard of care applicable to prudent lessors of equipment.[4] Accordingly, the Michigan product liability statute, including the presumption that United invokes under M.C.L. § 600.2946(4) based upon compliance with federal or state statutes or regulations, has no application in this case. *Cf. Nichani v. Schroeder Homes*, No. 267688, 2006 WL 2035608, at *3 (Mich. Ct. App. July 20, 2006) (per curiam) (concluding that because there was no buyer-seller relationship between the plaintiff and the defendants, product liability theories did not apply to the plaintiff's claims).

Although Plaintiff contends that United's duty to Weier included inquiring regarding the specific use for the crane, ensuring that Weier knew how to operate the crane and, as part of its investigation, providing a crane with a load limiting device, she fails to cite any federal or state statute, regulation or rule, or any industry standard that placed such obligations upon a lessor of a crane or similar equipment, such as United. As set forth above, it is undisputed that the applicable regulations at the time Broderson manufactured the IC-200 and sold it to United did not require the installation of a load limiting device. It is true that the ANSI standards were revised in March 2002, well after United purchased the crane from Broderson, to require that crane manufacturers provide load limiting devices on all cranes manufactured after the effective date, March 29, 2003 (less than two months before the accident), but that same revision and a subsequent opinion letter confirmed that retrofitting of existing equipment was not required in order to comply with the standard. (ASME B30.5-2004 § IV(c) New and Existing Installations ("It is not the intent of this volume to require retrofitting of existing equipment."); Interpretation 5-72 at I-2 (confirming that a crane

---

[4]A products liability claim would fail on the facts presented here for at least a couple of reasons. First, assuming that a defect could be shown, Plaintiff would have to prove that United was legally responsible for the defective design. *See Hendin*, 2002 WL 181760, at *1. Second, Plaintiff's expert, Dr. Purswell, stated that the crane was not defective when Broderson sold it to United, nor was it defective at the time Weier used it on the Jasper during the project. (Purswell Dep. at 68-69, 142.)

9

manufactured prior to the effective date and purchased or operated after the effective date without a load limiting device would comply with the revised standard).)  Furthermore, Plaintiff has failed to cite any case law from Michigan or any other jurisdiction imposing such obligations upon lessors of cranes.

Plaintiff's sole basis for arguing that United's duty extended to inquiring into the specific use of the crane and providing a load limiting device is the opinion of Dr. Purswell.  Dr. Purswell's opinion is essentially that rental companies are in the best position to determine the needs of their customers and their usage of cranes, including whether a crane should be equipped with an RCL or similar device.  Dr. Purswell testified in his deposition that in reaching his opinion that a crane rental company has a heightened duty to ensure that renters of cranes are qualified and to provide load limiting devices on rented cranes, whereas a manufacturer of a crane has no such duty, he relied upon his recall of a report prepared by Anis Ally, one of his graduate students, more than a decade ago. (Purswell Dep. at  83-88, 110-12, 113-14.)  The Court has reviewed the Ally study and agrees with United that it in no way supports Dr. Purswell's arbitrary distinction between crane manufacturers and crane rental companies.  Such a distinction was simply not a focus of the study.  Plaintiff has also submitted a supplemental affidavit from Dr. Purswell in which he states that the Ally study was "simply a minor piece in the overall pie" of the basis for his conclusions. (Purswell Aff. ¶ 2.)  Dr. Purswell states that  his "opinions are based upon [his] decades of experience with numerous manufacturers in the industry and investigation of numerous crane accidents." (*Id.*)  Although United contends that the Court should refuse to consider Dr. Purswell's affidavit because it was produced after the close of discovery and contradicts his prior deposition testimony, the affidavit is not material to the Court's analysis because the additional information contained therein to the effect that "renters of cranes only use the crane on a limited one time basis," renters' "past familiarity with

10

the crane is unknown," and the like, is insufficient to support the arbitrary distinction between crane manufacturer and crane lessor that Dr. Purswell draws.

In determining the extent of United's duty to Weier, Dr. Purswell's opinion must be considered in the context of the specific facts presented in this case, which suggest that other than furnishing a crane that was not defective and that was reasonably suitable for the known intended use, United had no further duty and was entitled to rely upon Weier in selecting the crane, including its necessary features. First, as Plaintiff admits, Weier "had extensive previous experience operating cranes in maritime construction projects in the Midwest, Gulf of Mexico and Pacific Ocean." (Pl.'s Resp. Br. at 4.) Weier was the expert with regard to operating a crane, not United or its employees, and he was not the theoretical inexperienced one-time renter envisioned by Dr. Purswell. In fact, Weier and UCC had rented a crane from United on at least one prior occasion, and that crane was not equipped with a load limiting device. Second, applicable regulations required Weier, as the operator of the crane, as well as Weier's employer, UCC, to comply with the manufacturer's specifications and not operate the crane in an overloaded condition. *See* 29 C.F.R. §§ 1910.180(h)(1)(I), 1926.550(a)(1); ASME B30.5-2004 § 5-3.2.1(a)-(c). Third, Weier was aware of the precise conditions under which the crane would be used, including the weight of the vibratory tool, the piling, and the load block, and was in the best position to determine whether the crane was in an overloaded condition. Moreover, if Weier was not aware of the underwater current that existed at the time of the accident, it is unreasonable to conclude that United could have foreseen that the current would have placed additional stress on the load, thus increasing the overload condition. While there is evidence that United employees were generally aware of UCC's operations and that the crane was to be used in or on the water, there is no evidence showing that United's employees had any knowledge of the specific use of the crane for placing pilings into the lake bed; nor is there

11

any evidence that United was aware of the weight of the load.[5]  Fourth, Weier was aware, or should have been aware, of the warnings that accompanied the crane and the vibratory tool regarding overloading and the use of an LMI.  The absence of an LMI or an RCL on the crane would have been apparent to Weier, and if Weier needed a crane with such a device he would have been the appropriate person to make that determination.  Finally, United provided a crane that was free of defects and had a 15 ton lifting capacity, which would have provided sufficient capacity to perform the job.  This is confirmed by the fact that Weier used the crane for two days to install approximately twenty pilings prior to the accident.  Moreover, Weier had all of the information that he needed in order to determine whether he was operating the crane in an overloaded condition.  Given these circumstances, there is no basis to conclude that United owed a duty to provide a crane with a load limiting device, to ascertain that Weier knew how to operate the crane, or to inquire further into the specific use of the crane.  For this reason, Plaintiff's negligence claim must fail.

**B.     Plaintiff Has Failed To Show That United Breached Any Implied Warranty**

Plaintiff alleges in her complaint that United breached its implied warranties by failing to warn that the crane was not equipped with a load limiting device and that the absence of such a device would subject the crane to tipping over, especially when the load was below the waterline and not visible to the operator. (Compl. ¶ 44(d.).)  A seller of a product has a "duty to warn purchasers or users of dangers associated with the intended use or reasonably foreseeable misuse of their products." *Glittenberg v. Doughboy Recreational Indus.*, 441 Mich. 379, 387, 491 N.W.2d 208, 211 (1992).  However, there is no duty to warn where "the danger is open and obvious to all users of the product, or where the specific dangers are fully known to the plaintiff at the time the injury

---

[5]Although Plaintiff claims that there is evidence that Weier faxed the specification chart for the vibratory tool to United, Jon Shelton testified that he did not know the identity of the recipient. (Shelton Dep. at 112-13.)

occurred." *Bullock v. Gulf & W. Mfg.*, 128 Mich. App. 316, 323, 340 N.W.2d 294, 297 (1983). In her response, Plaintiff appears to concede that United did not fail to provide any required warnings or that the potential danger of operating the crane was open and obvious to Weier, as she does not present any specific argument regarding lack of warnings. In any event, there is no basis for any failure to warn claim because United provided adequate warnings about the dangers of operating the crane in an overloaded condition and H & M Vibro provided a specific warning stating that a load indicator should be used in connection with the vibratory tool. Moreover, the danger would have been apparent to any user of the crane.

Plaintiff's sole contention is that the crane was not reasonably fit for its intended purpose because it was not equipped with a load limiting device. In order to establish a breach of warranty of fitness for a particular purpose, a plaintiff must show that the seller knew at the time of sale (1) of the particular purpose for which the good was to be used and (2) that the buyer was relying on the seller to furnish a suitable good. *See Leavitt v. Monaco Coach Corp.*, 241 Mich. App. 288, 293, 616 N.W.2d 175, 179 (2000) (quoting *Ambassador Steel Co. v. Ewald Steel Co.*, 33 Mich. App. 495, 501, 190 N.W.2d 275, 279 (1971)).

Plaintiff's claim fails for several reasons. First, there is no evidence that the IC-200 failed to perform as intended or that it was not fit for lifting loads within the specified capacity and boom configuration. The evidence, which is not in dispute, is that the accident occurred because Weier was operating the crane in an overloaded condition. Second, although Plaintiff contends that United knew or should have known of the particular purpose for which Weier and UCC intended to use the crane, there is no evidence that United was aware of the particular purpose, even though United knew generally that UCC was engaged in underwater construction and that it intended to use the crane on a work vessel. Finally, Plaintiff has not presented any evidence to establish that Weier was

13

relying upon United to select the particular crane for the job or that United was aware of any such reliance.  Therefore, the breach of implied warranty claim also fails.[6]

### IV. Conclusion

For the foregoing reasons, the Court will grant Broderson's and United's motions for summary judgment.

An Order consistent with this Opinion will be entered.


Dated:  December 11, 2006              /s/ Gordon J. Quist
                                       GORDON J. QUIST
                                       UNITED STATES DISTRICT JUDGE

---

[6] In light of its conclusion that the breach of implied warranty claim fails on the merits, the Court finds it unnecessary to address United's contention that it conspicuously disclaimed all implied warranties.